UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RONNIE W. JONES, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>)<br>)<br>Defendant. ) | Case No.: 1:12-cv-1267-TWP-TAB |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Ronnie Jones ("Mr. Jones"), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). 42 U.S.C. §§ 405(g), 1383(c)(3). For the following reasons, the Court **AFFIRMS** the Commissioner's decision.

**I.     BACKGROUND**

**A.     Procedural History**

On August 28, 2008, Mr. Jones filed applications for DIB and SSI, alleging a disability onset date of July 30, 2008, due to a heart attack. Mr. Jones' applications were initially denied on April 7, 2009, and were again denied upon reconsideration on September 16, 2009. Thereafter, Mr. Jones filed a request for a hearing on October 14, 2009.

A hearing was held on April 5, 2011, in Indianapolis, Indiana, before Administrative Law Judge James Norris ("the ALJ"). Mr. Jones, represented by counsel, appeared at the hearing. On May 18, 2011, the ALJ found that Mr. Jones was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act ("Act"). Subsequently, Mr. Jones submitted a request

for review of the ALJ's decision, which was denied by the Appeals Council of the Office of Disability Adjudication and Review on July 11, 2012. Mr. Jones filed a civil action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), for review of the ALJ's decision.

**B.  Factual and Medical Background**

Ronnie Jones was born on July 21, 1950, and was 60 years old at the time of the administrative hearing. He has a high school education and previously worked as a truck driver and plant manager.

**1.  Medical History**

In July 2008, Mr. Jones suffered a heart attack and sudden cardiac death, requiring defibrillation. After a left heart catheterization and the insertion of a stent into the proximal left anterior descending artery, the cardiologist diagnosed severe native two-vessel coronary artery disease, cardiogenic shock, and acute myocardial infarction.

An October 2008 x-ray of Mr. Jones' chest revealed a prominent heart and a slightly prominent pulmonary vascularity suggesting minimal interstitial edema. On November 10, 2008, Mr. Jones underwent an echocardiogram, which showed mild global hypokinesis of the left ventricle and a mildly decreased left ventricular systolic function. Following an additional left heart catheterization, Mr. Jones' cardiologist chose to stent the right coronary artery.

In December 2008, Mr. Jones' cardiologist determined that his cardiac condition was stable after additional testing and despite reported shortness of breath, excessive fatigue, and muscle aches. Later that month, Mr. Jones underwent an exercise myocardial perfusion imaging study, which had to be discontinued due to his "marked leg fatigue." The test showed that Mr. Jones' left ventricular systolic function was low-normal with an ejection fraction of 50% and his anterior perfusion defect was consistent with transmural myocardial infarction and minimal peri-infarction ischemia, but did not meet the criteria for significant ischemia.

In January 2009, a Doppler ultrasound of Mr. Jones' lower extremities indicated very mild peripheral vascular disease induced by exercise in the right leg. In February 2009, Mr. Jones was evaluated by Dr. Juan Weskler ("Dr. Weskler"), his cardiologist. Dr. Weskler noted his belief that Mr. Jones' complaints of tiredness, myalgias, back pain, dizziness, cold intolerance, and orthostatic symptoms were the result of hypothyroidism or dehydration and that his chest discomfort was noncardiac in nature.

On March 11, 2009, Mr. Jones presented for a consultative physical examination at the request of the Disability Determination Bureau ("DDB"). He complained of constant fatigue and shortness of breath with moderate activity, but denied any recurrent chest pain. Additionally, Mr. Jones reported a recent onset of bilateral pain in his legs and lower back and stated that he could walk on a treadmill for seventeen minutes and lift fifteen to twenty pounds with either arm.

On April 7, 2009, a medical consultant for the DDB reviewed the evidence of record and completed a physical assessment. He determined that Mr. Jones could occasionally lift 50 pounds, frequently lift 25 pounds, and sit, stand, or walk for six hours in an eight hour day. The consultant concluded that Mr. Jones suffered no postural, manipulative, or environmental limitations and that his only impairment was coronary artery disease. In September 2009, another state agency reviewing physician reviewed the record and concurred with the first consultant.

On July 16, 2009, Mr. Jones underwent an adenosine nuclear cardiac perfusion study, which showed mildly reduced left ventricular systolic function with an ejection fraction of 40 to 45 percent, a large anterior, septal, and apical perfusion defect consistent with nontransmural myocardial injury without significant ischemia, and severe hypokinesis of the anterior wall, apex, and septum. These results represented no significant difference from the December 2008

study. It was noted that Mr. Jones experienced shortness of breath despite walking slowly on the treadmill.

On July 29, 2009, Mr. Jones saw his primary care physician, Dr. Jan Peterson ("Dr. Peterson"), for a physical examination in order to renew his commercial driver's license. Mr. Jones reported that he was self-employed and drove a semi-truck. At that time, Dr. Peterson concluded that Mr. Jones was medically cleared for a two year commercial driver's license. The same day, Dr. Peterson completed a questionnaire regarding Mr. Jones' physical ability to work. She opined that Mr. Jones could occasionally lift 50 pounds and had no difficulty sitting, standing, or walking; that he required no manipulative limitations; that he could climb, balance, and crouch occasionally; that he required no limitations in exposure to dust or vibration; and that he could not bear unlimited exposure to temperature extremes, humidity, fumes, odors, chemicals, or gases. When the questionnaire asked whether Mr. Jones' impairments were "likely to produce 'good days' and 'bad days,'" Dr. Peterson checked yes. She then checked a box indicating that Mr. Jones would likely be absent from work about four days per month as a result of his impairments or treatment. When asked when Mr. Jones' medical condition first became severe enough to warrant the limitations she set forth, Dr. Peterson wrote "after MI 7/30/08," in reference to Mr. Jones' heart attack.

Mr. Jones underwent another consultative physical examination on August 11, 2009. Despite complaints of shortness of breath, fatigue, and an inability to walk for more than 15 minutes, Mr. Jones' cardiac examination was normal, extremity strength was normal, and his joints and dorsolumbar spine was within normal limits. Mr. Jones did report bilateral shoulder tenderness and pain at 45 degrees with straight leg raising, but he had no stiffness, effusion, or swelling in his joints or tenderness in any portion of his spine.

In March 2010, Mr. Jones sought an orthopedic consultation for shoulder pain, which he reported experiencing intermittently for 12-15 years and more severely after a fall 4-5 years prior. An MRI showed that Mr. Jones had a chronic partial thickness rotator cuff tear of his right shoulder. His condition improved with conservative treatment and physical therapy, though Mr. Jones reported that he was not completely pain free and that some activities, such as power washing and shooting basketball, caused him pain. His orthopedic specialist warned that Mr. Jones might need surgery if problems persisted.

In 2010, Mr. Jones twice chose not to take recommended medication for his cardiac condition due to his desire to continue taking Cialis. The second time occurred on April 26, 2010, when he went to the emergency room with complaints of intermittent sharp chest pain. Mr. Jones reported that the pain was "pretty infrequent" and that he did not have shortness of breath.

Throughout 2010 and 2011, Mr. Jones continued to receive treatment for his various conditions, and his symptoms seemed to come and go. For example, at times, he described being able to work in the garden all day without chest discomfort and going on two mile jogs, while other times he complained of fatigue and malaise with even mild exertion and became very short of breath and reported chest pain that subsided with nitroglycerin after walking several yards in the snow. Additional cardiac catheterizations and cardiac perfusion studies estimated left ventricle ejection fractions between 40 and 60 percent, hypokinesis, and significant peri-infarct ischemia.

### 2. Administrative Hearing Testimony

At the hearing on April 5, 2011, testimony was given by Dr. Lee Fischer ("Fischer"), the medical expert, Robert Barber, the certified rehabilitation counselor and Mr. Jones. Dr. Fischer was the first to testify. He testified that he had received and reviewed the medical evidence in

the case. Dr. Fischer then briefly discussed Mr. Jones' heart attack, cardiac infarction, and reduced ejection fraction. He also mentioned Mr. Jones' hypothyroidism, gastroesophageal reflux disease, diabetes mellitus, hyperlipidemia, chronic obstruction pulmonary disease, weight, and shoulder pain, the last of which he described as appearing to have resolved. Dr. Fischer described the prior evaluations of Mr. Jones' capacity and stated that he found no basis in the record for Dr. Peterson's limitation of four missed days of work per month. It was Dr. Fischer's opinion that, given his limitations, Mr. Jones could perform light, but not medium, work.

Mr. Jones then testified, describing his 40 years of experience as a truck driver. Mr. Jones explained that he cannot continue to work as a truck driver on his doctor's advice due to the risk of him suffering another heart attack while driving. Mr. Jones then testified to his symptoms and limitations, stating that he tires quickly from exertion, has had a couple of instances of chest pain, has been to the hospital for chest pain, and has awakened in the middle of the night with chest pain. He stated that the chest pain can be brought on by stress and physical exertion. Mr. Jones said that he might occasionally be able to lift 50 pounds, but that he was not sure. He said that he walks at least a mile three or four times a week and sometimes every day at his doctor's advice. He said that just talking was making him out of breath, and that if he were to work, he would occasionally need ten to fifteen minutes to recuperate. Mr. Jones also mentioned his need to go to the restroom frequently as a result of his medication. Mr. Jones then testified that he experiences fatigue and lack of energy three to four days a week and that his cardiologist says this is the result of damage to his heart.

Next, the ALJ questioned Mr. Jones regarding his work history, and Mr. Jones testified that he had worked as a plant manager for a significant period of time despite his earlier testimony that he was a truck driver. Mr. Jones explained that as part of his job, he still drove a

truck while he was plant manager, though only about 20 percent as many miles. The ALJ then inquired into the nature of Mr. Jones' work during a period when he owned several trucks and hired others to drive them.

Finally, Mr. Barber, the vocational expert ("the VE"), was allowed to ask Mr. Jones about his duties as a plant manager. Ultimately, the VE testified that plant manager was a light, skilled job. He testified that a hypothetical 55 year-old, with a high school education and past relevant work as a truck driver and plant manager, who was "limited to light work as defined by the regulations, occasional climbing, balancing, stooping, crouching and crawling except for ladders, ropes and scaffolds which should not be scaled at all nor should unprotected heights," would be able to perform the job of plant manager, but, if unable to perform light work, he would not be. The VE further testified that the skills of a plant manager are transferable and that someone with those skills could perform other jobs, for example: dispatcher, telemarketer, and sorter. Finally, Mr. Jones' counsel asked the VE whether any of those positions would tolerate four absences a month and he answered that he did not believe they would.

## II.    DISABILITY AND STANDARD OF REVIEW

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to qualify as disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment that exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a severe impairment that significantly limits his ability to perform basic work activities, and that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(iii). In order to determine steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), which is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96–8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 416.920(a)(4)(v).

In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see also* 42 U.S.C. § 405(g). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dixon*, 270 F.3d at 1176. Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of

contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

As an initial matter, the ALJ found that Mr. Jones met the insured status requirements of the Act through December 31, 2013. And, at step one, the ALJ found that Mr. Jones had not engaged in substantial gainful activity since July 30, 2008.

At step two, the ALJ found that Mr. Jones had the following severe impairments: cardiomyopathy with history of cardiac infarction, hypothyroidism, diabetes mellitus, obesity, high cholesterol and triglycerides, right shoulder dysfunction, gastroesophageal reflux disease, chronic kidney disease, and chronic obstructive pulmonary disease. The ALJ found that although Mr. Jones had alleged limitations due to hearing impairment at times, Mr. Jones did not have a severe medically determinable hearing impairment. The ALJ also noted that Mr. Jones had not alleged any specific limitations despite the presence of medically determinable impairments of depression and anxiety, and determined that the evidence failed to establish these conditions were severe. At step three, the ALJ found that Mr. Jones did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

In order to move on to steps four and five, the ALJ found that Mr. Jones had the RFC to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: occasionally climbing stairs; occasionally balancing, stooping, kneeling, crouching, and crawling; no climbing ladders, ropes, or scaffolds; and avoiding unprotected heights.  In the assessment, the ALJ first found that Mr. Jones had a medically determinable impairment that could reasonably be expected to cause his alleged symptoms. But, the ALJ found Mr. Jones' statements regarding the intensity, persistence, and limiting effects of his symptoms to not be reasonably consistent with the overall evidence of record or his RFC. To that extent, the ALJ found Mr. Jones' statements to not be credible.  Additionally, the ALJ found the testimony of Mr. Jones' treating physician to be entitled to less weight than that of the medical consultant.

At step four, the ALJ found that Mr. Jones was capable of performing his past relevant work as a plant manager, because such work did not require the performance of activities precluded by Mr. Jones' RFC.  Despite Mr. Jones' initial testimony that his only past work was as a truck driver, Mr. Jones previously reported working as a plant manager for sixty hours per week from at least 1993 through 1998.  Thus, the ALJ found that this work qualified as substantial gainful activity and that Mr. Jones was capable of performing this work.

At step five, the ALJ found that, even if Mr. Jones was not capable of performing his past relevant work as a plant manager, Mr. Jones possessed skills from his past work that are transferable to other occupations with jobs existing in significant numbers in the national economy.  The VE testified that an individual matching Mr. Jones' profile could perform jobs including dispatcher, telemarketer, and sorter.  On this basis, the ALJ found that, though Mr. Jones' additional limitations do not allow him to perform the full range of light work, a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rule 202.07.

As a result of the foregoing findings, the ALJ found that Mr. Jones was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.

## IV. DISCUSSION

A. **Substantial Evidence Supports the ALJ's Finding That Mr. Jones Was Capable of Performing His Past Relevant Work in Addition to Other Jobs.**

In reviewing the ALJ's decision and all of the evidence contained in the record, this Court holds the ALJ's finding that Mr. Jones was not disabled to be supported by substantial evidence and based upon sufficient consideration of all of the relevant evidence. The ALJ's decision to give reduced weight to the opinion of Mr. Jones' treating physician was not improper given the finding that the Dr. Peterson's opinion was unsupported by the medical evidence, a finding which the ALJ properly supported with good reasons and an explanation of the substantial evidence underlying his conclusions. Further, the ALJ did not err in his assessment of Mr. Jones' RFC. Finally, the ALJ's finding that Mr. Jones' testimony lacked credibility was not patently wrong. For these reasons, the ALJ's determination will not be disturbed.

1. **The ALJ's Findings Regarding the Weight of the Treating Physician's Testimony Were Properly Supported and Based on Substantial Evidence.**

Mr. Jones argues that the ALJ "refused to confer Dr. Jan Peterson's opinion controlling weight, failed to offer a good reason for discounting the most relevant portion of the opinion, and failed to weigh it with the mandatory factors." Dkt. 19 at 19. Further, he argues that the ALJ's decision to give greater weight to the opinion of the consulting physician, Dr. Fischer, was error. However, because the ALJ's decision is reasonable and supported by his articulated reasons and the medical evidence, the decision to give greater weight to the opinion of Dr. Fischer was not error.

A treating source's opinion is properly given reduced weight if it is not supported by medically acceptable clinical and laboratory diagnostic techniques and it is inconsistent with the other substantial evidence in the record.  On the issue of the appropriate weight to be given to a treating source's opinion, the regulations state, "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).  And, when an ALJ decides to reject a treating source's opinion, "good reasons" must be given.  *Id*.  Thus, if a treating source's testimony is well-supported and not contradicted, "there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it."  *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).  However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight."  *Id*.

Here, the Court is persuaded that the ALJ did not err by giving little weight to Dr. Peterson's assessment that Mr. Jones would likely miss more than four days of work per month as a result of his impairments. The ALJ expressly articulated seven reasons for giving little weight to Dr. Peterson's assessment: 1) Dr. Peterson's RFC contains very little explanation, 2) Dr. Peterson's assessment fails to explain the limiting effect of a "mildly decreased ejection fraction," 3) Dr. Peterson's assessment lists degenerative disc disease of the lumbar spine as an additional condition despite the fact that the medical evidence of record does not support a determination of this medically determinable impairment, 4) Dr. Peterson's assessment fails to mention Mr. Jones' many other impairments and was written in 2009, which means it was written without the benefit of reviewing prior relevant evidence and was written less than a year

after the alleged onset date, 5) as a primary care physician, Dr. Peterson is a treating source, but not Mr. Jones' treating cardiologist, 6) Dr. Peterson's assessment asserts a range of medium exertional level work but then indicates that such work would not be sustainable, and 7) Dr. Peterson cleared Mr. Jones for a two year commercial driver's license on the same day that she conducted her assessment. See Dkt. 15 at 31-32.

Mr. Jones argues that the ALJ erred by failing to contact Dr. Peterson to clarify the reasons for her opinion. Although an ALJ is required to re-contact a treating source for clarification of the reasons for the opinion where the ALJ "cannot ascertain the basis of the opinion from the case record," SSR 96-5P, 1996 WL 374183 (July 2, 1996), in the immediate case, the ALJ was not unable to ascertain the basis of Dr. Peterson's opinion, but rather, the ALJ found it to be unsupported and inconsistent with the substantial evidence in the medical record. Thus, further contact was not required.

In contrast to Dr. Peterson's opinion, the ALJ stated with specificity why he gave greater weight to Dr. Fischer's testimony. The ALJ pointed to the fact that Dr. Fischer's opinion was well-supported by the medical evidence and as the consulting medical expert; he had reviewed all of the medical evidence. Dkt. 15 at 31. Because the ALJ's findings were supported by substantial evidence and good reasons, and because Dr. Peterson's prediction of four days absence monthly was not supported by medically acceptable clinical and laboratory diagnostic techniques, the decision to give greater weight to Dr. Fischer's opinion was not error. Accordingly, the Court is not persuaded by Mr. Jones' first argument.

**B.     The ALJ's Assessed RFC Considered All Relevant Evidence and Is Supported by Substantial Evidence.**

Mr. Jones next argues that the ALJ's assessed RFC is not supported by substantial evidence. He argues that the ALJ failed to account for Mr. Jones' alleged need for unanticipated breaks due to coronary artery disease.

RFC findings are solely within the discretion of the Commissioner as long as they are based on substantial evidence. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Thus, this Court will not set aside an ALJ's RFC as long as it relies on substantial evidence.

Here, the ALJ's reliance on Dr. Fischer's testimony was supported by substantial evidence. After assessing the credibility of Mr. Jones' testimony regarding his exertional limitations, the ALJ thoroughly described Mr. Jones' medical history, citing both to the medical record and Dr. Fischer's testimony. For example, noting that the claimant's cardiac impairment was initially "very severe," the ALJ found, based on the foregoing, that Mr. Jones "does not have significant ischemia and that his ejection fraction is only mildly reduced." Dkt. 15 at 27. Contrary to Mr. Jones' assertion that the ALJ "failed to account [sic] the claimant's need for unanticipated breaks due to the subjective symptoms associated with coronary artery disease," the ALJ found Mr. Jones' statements on this point lacking credibility and unsubstantiated by the medical record. *Id*. at 26.

Mr. Jones also argues that the ALJ erred by failing to consider his other conditions in the RFC findings. On the contrary, the ALJ explicitly addressed Mr. Jones' hypothyroidism, gastroesophageal reflux disease, chronic obstructive pulmonary disease, obesity, and shoulder pain and dysfunction. *Id.* at 27-29. Based on the medical record and after discussing all of the relevant evidence, the ALJ found that "the objective medical evidence regarding these impairments also fails to fully support the claimant's alleged limitations." *Id.* at 27.

Mr. Jones further argues that the ALJ failed to properly evaluate his complaints of back pain. However, the ALJ explicitly stated that "the objective medical evidence of record fails to establish a medically determinable impairment of degenerative disc disease." *Id*. at 31. No doctor ever assessed Mr. Jones as having a back impairment with the exception of a single notation from Dr. Peterson during a single examination. Even Dr. Peterson found Mr. Jones to be capable of performing medium level work despite her notation. *Id*. at 32.

Mr. Jones' allegations that the ALJ failed to consider his peripheral vascular disease and calcaneal spurs must similarly fail because Mr. Jones himself fails to articulate what limitations these conditions impose, and the medical record is devoid of any evidence of such limitations. Since the applicant and his lawyer know his case better than anyone, a social security claimant bears the burden of supplying evidence to prove his claim of disability, *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006), and an ALJ is "entitled to assume" that an applicant represented by an attorney is making his "strongest case for benefits," *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987). Thus, the ALJ's findings cannot be said to have ignored relevant evidence where none is presented.

Finally, Mr. Jones argues that the ALJ erred by imposing "undocumented postural limitations." Even if this were the case, it would not help Mr. Jones. If he is correct, then the ALJ's RFC was limited too much rather than too little, as Mr. Jones must establish if he is to prevail. Therefore, the ALJ's determination that Mr. Jones could perform light work, with the limitations noted above in Section III, was supported by substantial evidence.

C.   **The ALJ's Finding That Mr. Jones' Testimony Lacked Credibility Was Supported by Legitimate Justifications and Was Therefore Not Patently Wrong.**

Social Security Ruling 96-7p requires that a credibility determination "contain specific reasons for the finding on credibility, supported by the evidence in the case record." *Prochaska*

*v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference . . . [and] will reverse an ALJ's credibility determination only if the claimant can show it was patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citations and internal quotations omitted). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)).

The ALJ found that Mr. Jones' statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are not reasonably consistent with the overall evidence of record or the residual functional capacity, which was calculated by using the reasonably consistent standard." Dkt. 15 at 26. In reaching this finding, the ALJ referred specifically to Mr. Jones' testimony and cited to the medical record. The ALJ compared Mr. Jones' testimony regarding his limitations to his previous statements to treating physicians regarding his activity level and found them to be inconsistent. *Id.* Ultimately, the ALJ found Mr. Jones testimony of his activities and that of the treating physicians that Mr. Jones would miss four day of work per month, to be inconsistent with the objective medical evidence. Because the ALJ's credibility determination was based on conflicts between the objective medical evidence and Mr. Jones' testimony, it was not unreasonable, unsupported, or patently wrong.

## V.  CONCLUSION

First, substantial evidence supports the ALJ's finding that Mr. Jones was capable of performing his past relevant work in addition to other jobs. Second, the ALJ's assessed RFC

16

considered all relevant evidence and is supported by substantial evidence. Finally, the ALJ's finding that Mr. Jones' testimony lacked credibility was supported by legitimate justifications and was, therefore, not patently wrong. For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

**SO ORDERED.**

Date: 12/09/2013 _____

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov